**F I L E D**
United States Court of Appeals
Tenth Circuit

**NOV 3 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellant,

v.

MANUEL LEYVA-SERRANO,

    Defendant-Appellee.

No. 97-2051

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. CR-96-467-MV)**

---

Charles L. Barth, Assistant United States Attorney (John J. Kelly, United States Attorney, with him on the brief), Albuquerque, New Mexico, for the Appellant.

Joe M. Romero, Jr., Romero & Associates, P.A., Albuquerque, New Mexico, for the Appellee.

---

Before **BRISCOE**, Circuit Judge, **LUCERO,** Circuit Judge, and **McWILLIAMS**, Senior Circuit Judge.

---

**McWILLIAMS, Senior Circuit Judge.**

---

In a one count indictment filed on August 7, 1996, Manuel Leyva-Serrano was

charged with the possession of 50 grams of cocaine with an intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 18 U.S.C. § 2. Pursuant to Fed. R. Crim. P. 12(b)(3), on January 7, 1997, Serrano filed a motion to suppress the use at trial of the crack cocaine seized by the police in a search of his automobile, contending that the "stop and seizure" was unlawful. The government filed a response to the motion to suppress, contending that, under the circumstances, the "stop and seizure" was lawful.

An evidentiary hearing was held on the issues presented by the motion to suppress and response thereto on January 21, 1997, at which time Desi Garcia, a police officer for the City of Albuquerque who effected the "stop" and thereafter made the "search and seizure," testified at length. Serrano, a Cuban national expelled from Cuba who had been living in Albuquerque since 1993, also testified briefly. At the conclusion of the hearing, the district court, after argument of counsel, granted Serrano's motion to suppress, holding that the "stop" was not supported by reasonable, articulable suspicion as required by *Terry v. Ohio,* 392 U.S. 1 (1968) and, alternatively, that the ensuing search of Serrano's automobile and the seizure of the 50 grams of crack cocaine were improper since the "arresting police officer did not believe he was in any danger." The government then filed a timely notice of appeal pursuant to 18 U.S.C. § 3731. We reverse. This case turns on the facts and circumstances leading up to the stop and seizure, and they will be set forth in some detail.

In August, 1995, Garcia, a detective in the Albuquerque Police Department

assigned to the homicide unit, was investigating two unsolved murders that had occurred in Albuquerque in July, 1995. One involved Cara Garner, a prostitute, who was shot and killed behind the Trade Winds Motel in Albuquerque. The second involved an Avelio Guzman, who was stabbed in the neck and then shot and killed. During the course of his investigation, Detective Garcia was advised by other members of the Albuquerque Police Department that Tracy Bankhead perhaps knew the person, or persons, who might be involved in these two homicides, or who, at least, might know something about the murders. Accordingly, Detective Garcia arranged an interview with Bankhead at police headquarters on August 31, 1995.

During the August 31st interview, Detective Garcia asked Bankhead questions about the Garner homicide, although he did not use the name "Garner," since Bankhead did not recognize that name, as such. Rather, Detective Garcia asked Bankhead about a prostitute who had been shot and killed behind the Trade Winds Motel in Albuquerque. In the interview, Bankhead stated that on one particular evening, a month or so prior to the interview, she and Serrano, and two others, had gone to the Trade Winds Motel to look for a prostitute who owed Serrano, and the others, money for narcotics. She said that Serrano and one of the others were armed. Bankhead also said that they were unable to locate the prostitute, and that the four of them returned to her residence. Bankhead went on to say that shortly thereafter the three men left her residence. The next day, according to Bankhead, she heard news reports that a prostitute had been shot to death

- 3 -

behind the Trade Winds Motel.

As concerns the murder of Guzman, also a Cuban national, investigators were of the opinion that the person killing Guzman had, himself, received serious knife wounds in the course of the homicide. Guzman apparently died more-or-less on the spot, and a trail of blood lead away, and a long way, from the scene of the homicide. When interviewed by Detective Garcia, Bankhead stated that Serrano had received some sort of a "laceration" around the date of the Guzman homicide, although she thought it was slightly prior to the date of the murder. Bankhead also provided Detective Garcia with the addresses, phone numbers and pager numbers of Serrano and the others who had been with her at the Trade Winds Motel, and stated that Serrano could be located in the 400 block of Virginia SE in Albuquerque.

Based on the information given him by Bankhead, Detective Garcia considered Serrano a "suspect" in both the Garner and Guzman homicides. After the interview with Bankhead, Detective Garcia, on the same day, drove by the address on Virginia SE to look for an automobile owned by Serrano, which Bankhead had described as a red Pontiac convertible. Detective Garcia espied such a vehicle, and, after driving around the block, saw the vehicle pulling away from the curb. Detective Garcia followed in his unmarked police vehicle. As Detective Garcia followed, he noted the driver of the red Pontiac convertible "looking" at him in his side-view and rear-view mirrors. The driver of the red Pontiac did not "accelerate," although he did, at one point, make a sharp right-

hand turn and shortly thereafter made a U-turn. About this time, Serrano was stopped by an officer in a marked police car who had been called in by Detective Garcia to make the stop.

After the driver of the red Pontiac convertible was stopped, the driver being Serrano, the uniformed officer ordered him to step out of his vehicle, which he did. The arresting officer, after "patting" down Serrano, and finding no contraband, ordered him to the marked police vehicle. Simultaneously, Garcia went to the passenger door of the red Pontiac convertible to look for firearms. Putting his hand under the passenger's seat, Garcia found what he thought was a .25 caliber or .380 caliber handgun wrapped in some sort of a plastic wrap. Bringing the object out from under the seat, it proved not to be a firearm, but crack cocaine wrapped in some sort of plastic. Detective Garcia testified that his was a "protective search" of the red Pontiac convertible, because he was concerned, *inter alia,* that if Serrano declined to converse with him, and they returned him to his vehicle, that he might then "open fire." So much for the "facts" as developed at the evidentiary hearing on Serrano's motion to suppress.

In *United States v. Foster,* 100 F.3d 846, 849 (10th Cir. 1996) we spoke of our scope of review of a district court's order granting a pre-trial motion to suppress as follows:

> When reviewing an order granting a motion to suppress, this court accepts the trial court's factual findings unless clearly erroneous, and views the evidence in the light most favorable to the district court's finding. *United States v.*

> *Little,* 18 F.3d 1499, 1503 (10th Cir. 1994) (en banc).
> Moreover, at a hearing on a motion to suppress, "the
> credibility of the witnesses and the weight given to the
> evidence, as well as the inferences and conclusions drawn
> therefrom, are matters for the trial judge." *United States v.
> Fernandez,* 18 F.3d 874, 876 (10th Cir. 1994). Nevertheless,
> we review de novo the ultimate determination of the
> reasonableness of a search under the Fourth Amendment.
> *United States v. Callwood,* 66 F.3d 1110, 1112 (10th Cir.
> 1995).

As indicated, at the hearing on the motion to suppress there were only two witnesses, Detective Garcia and Serrano, the defendant. Detective Garcia testified in considerable detail concerning his investigation into the deaths of Garner and Guzman and the events leading up to the "stop" of Serrano and the ensuing "seizure" of the crack cocaine. Serrano's testimony was brief. He testified as to where he was going at the time of his stop, and to the fact that he exited his vehicle upon an order from the policeman in the marked police vehicle, and was searched for weapons.[1] The district judge stated that, although she believed Detective Garcia's testimony to be "credible," she was nonetheless of the view that his "stop and seizure" was not based on a reasonable, articulable suspicion. Under such circumstances we, too, accept Detective Garcia's testimony as "credible" and our problem is whether such equates with a reasonable, articulable suspicion. We believe it does.

---

[1]Serrano also testified that, as of that time, he had never been convicted of a felony, and that, after being interviewed, he was released from custody two days later and was not charged with the drug charge in the present case until about a year later, and was never charged with the murders of Garner and Guzman.

The legality of Detective Garcia's "stop" of Serrano's vehicle, with the aid, of course, of his fellow officer driving a marked police vehicle with lights and sirens, is governed by the principles of *Terry v. Ohio,* 392 U.S. 1, 22 (1968), where the Supreme Court spoke as follows:

> Applying these principles to this case, we consider first the nature and extent of the governmental interest involved. One general interest is of course that of effective crime prevention and detection; it is this interest which underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. It was this legitimate investigative function Officer McFadden was discharging when he decided to approach petitioner and his companions.

We recognize that *Terry* was concerned with police who were observing what they thought was an on-going crime committed in front of their own eyes, whereas we are here concerned with Detective Garcia investigating a so-called "past crime." In this regard, the Supreme Court in *United States v. Hensley*, 469 U.S. 221, 229 (1985) spoke as follows:

> Despite these differences, where police have been unable to locate a person suspected of involvement in a past crime, the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice. Restraining police action until after probable cause is obtained would not only hinder the investigation, but might also enable the suspect to flee in the interim and to remain at large. Particularly in the context of felonies or crimes involving a threat to public safety, it is in

the public interest that the crime be solved and the suspect detained as promptly as possible. The law enforcement interests at stake in these circumstances outweigh the individual's interest to be free of a stop and detention that is no more extensive than permissible in the investigation of imminent or ongoing crimes.

*See also United States v. Douglas,* 36 F.3d 1106 (10th Cir. 1994) (officer's stop of an automobile because the passenger fit the description of a person suspected in a past armed robbery deemed reasonable).

In *Terry* the Supreme Cout held that not only was the "stop" lawful, but that the ensuing "frisk" wherein a weapon was found was also lawful. We recognize that in the instant case the "frisk" of Serrano revealed no contraband, but that the more-or-less contemporaneous search of his vehicle for a firearm revealed the 50 grams of crack cocaine. The legality of such a search and seizure is largely controlled by *Michigan v. Long,* 463 U.S. 1032 (1983).

In *Michigan,* the Supreme Court stated that a protective search for firearms of the passenger compartment of a vehicle which a suspect had been driving was "reasonable" under the principles enumerated in *Terry v. Ohio, supra,* where the police had a "reasonable belief" that the suspect posed a danger. In this latter connection, Detective Garcia had been advised by Bankhead that Serrano carried a gun, which, of course, could be either on his person or in his vehicle. Detective Garcia, in our view, had a "reasonable belief" that Serrano posed a danger which justified a search of the interior of Serrano's vehicle for firearms. In *Michigan,* as in our case, the search of the vehicle for firearms

- 8 -

disclosed drugs.  In this general connection, the Supreme Court in *Michigan* spoke as

follows:

> These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.  *See Terry,* 392 U.S., at 21. "[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.,* at 27.  If a suspect is "dangerous," he is no less dangerous simply because he is not arrested.  If, while conducting a legitimate *Terry* search of the interior of the automobile, the officer should, as here, discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances.  *Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed. 2d 564 (1971); *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed. 2d 486 (1978); *Texas v. Brown,* --- U.S. ---,---,---, 103 S.Ct. 1535, 1541, 1544, 75 L.Ed. 2d 502 (1983).

> * * * * * * * *

> The circumstances of this case clearly justified Deputies Howell and Lewis in their reasonable belief that Long posed a danger if he were permitted to reenter his vehicle . . . ."

*Michigan,* 463 U.S. at 1049-1050; *see also United States v. Pappas,* 735 F.2d 1232, 1234

(10th Cir. 1984) (protective search of compartment in defendant's car was reasonable

under principles laid down in *Terry* and reiterated in *Michigan).*

In sum, under the authorities above cited, Detective Garcia had a reasonable suspicion that Serrano had been involved in, or knew something about, the murders of Garner and Guzman, and, such being the case, neither his stop of Serrano's vehicle nor the protective search of Serrano's vehicle which resulted in the seizure of the crack cocaine hidden under the passenger's seat was unlawful. The district court erred in granting the motion to suppress.

Judgment reversed and case remanded with directions that the district court vacate its order granting Serrano's motion to suppress, with further proceedings to be consistent with the views herein expressed.