**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 9 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

STUART PALMER,

Defendant - Appellant.

No. 03-5115

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. 02-CR-172-C)

Submitted on the briefs [*]:

Fred Randolph Lynn, Tulsa, Oklahoma, for Defendant - Appellant.

David E. O'Meilia, United States Attorney, and Leena M. Alam, Assistant
United States Attorney, Tulsa, Oklahoma, for Plaintiff - Appellee.

Before **HENRY** , **BALDOCK** , and **HARTZ** , Circuit Judges.

**HARTZ** , Circuit Judge.

---

[*]After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

On September 30, 2002, Defendant Stuart Joseph Palmer was stopped by an officer of the Tulsa Police Department for speeding in a school zone. The officer subsequently found a loaded semiautomatic handgun when conducting a protective search for weapons in the locked glove box of Defendant's vehicle. Defendant was indicted for possession of a firearm by a convicted felon, in violation of 18 U.S.C § 922(g)(1). Contending that the search of the locked glove box violated the Fourth Amendment, Defendant moved the district court to suppress the gun. After the district court denied his motion, Defendant reached a plea agreement with the government. He entered a conditional plea of guilty to the indictment, reserving his right to appeal the denial of his motion to suppress. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

"In reviewing the denial of a motion to suppress, we accept the factual findings of the district court unless they are clearly erroneous." United States v. Botero-Ospina, 71 F.3d 783, 785 (10th Cir. 1995) (en banc). The final determination whether a warrantless search was reasonable under the Fourth Amendment is a question of law to be reviewed de novo. Id. "We view the evidence on appeal in the light most favorable to the government." Id.

I.    BACKGROUND

Officer Paul Downe observed a 1991 Buick driven by Defendant traveling 46 miles per hour in a 25 mile-per-hour school zone at approximately 9 a.m. on September 30, 2002. Downe activated his police car's emergency lights and siren to get Defendant's attention. Driving behind Defendant, Downe signaled Defendant to pull over. Defendant looked back at the police car and pointed to himself, as if to ask "me?" Downe nodded and motioned for Defendant to pull over into a nearby Arby's parking lot. Rather than turn immediately, Defendant remained in his lane of traffic, made a left turn at the next light, and accelerated. When Downe reactivated his siren, Defendant promptly crossed a lane of traffic and pulled into a NAPA parking lot.

Defendant drove through the parking lot, bypassing approximately 25 empty parking spaces. He eventually stopped on the far side of the lot. From the time Downe first signaled Defendant to pull over until the time Defendant stopped in the parking lot, Downe observed Defendant reaching behind the seat and then back toward the glove box, and leaning forward as if reaching for something under the seat.

As Downe got out of his patrol car and approached Defendant's vehicle, he saw Defendant continue to make movements toward his feet or under the seat, and toward the passenger side and glove box. Downe observed Defendant's hand near the glove box, which was open, and saw Defendant close the glove box.

Downe obtained Defendant's driver's license and returned to his patrol car to conduct a license check and prepare a citation. As he was doing this, a black pickup truck pulled up next to the patrol car. The driver told Downe that he had witnessed Defendant trying to hide something after Downe had signaled him to stop.

Downe radioed the police dispatcher to obtain backup. While waiting for backup to arrive, Downe conducted a record check on his laptop computer. It indicated that Defendant was an ex-convict and warned that Defendant had been armed and dangerous. Downe continued to observe Defendant moving back and forth in his seat and leaning toward the glove box and under his seat.

Shortly thereafter, Officer Goad arrived on the scene. Downe explained to him what had happened and asked him to check the inside of Defendant's vehicle. Downe removed Defendant from the vehicle, patted him down, and sat him in the patrol car while Goad searched the vehicle. Goad's search revealed no weapons. Downe asked Goad to watch Defendant while he searched the vehicle himself. During his search Downe tried to open the glove box, which was locked. He removed the keys from the ignition and used them to unlock the glove box, where he found a loaded semiautomatic handgun.

## II. DISCUSSION

"[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation . . . ." Botero-Ospina, 71 F.3d at 787. In addition, when police officers have a reasonable suspicion based on specific and articulable facts that a properly detained driver may be dangerous and "'may gain immediate control'" of weapons, they may conduct a weapons search of the driver's person and the passenger compartment of the vehicle. United States v Leyva-Serrano, 127 F.3d 1280, 1283 (10th Cir. 1997) (quoting Michigan v. Long, 463 U.S. 1032, 1049 (1983)). Thus, the question in this case is whether Downe had a reasonable and articulable suspicion sufficient to justify the weapons search of the passenger compartment of the vehicle, including the glove box.

We agree with the district court that the specific facts and circumstances here gave rise to a reasonable suspicion that Defendant was dangerous and could gain control of a weapon. The observations of Officer Downe, supported by those of the passing motorist, clearly indicated that Defendant was trying to delay his encounter with the officer until he could hide something in his glove box. When the license check revealed that Defendant was an ex-convict who had been considered armed and dangerous, Officer Downe had more than sufficient evidence to support a reasonable suspicion that Defendant was dangerous and was hiding a weapon in the glove box.

More problematic is whether there is reason to believe that a suspect "may gain immediate control" of a weapon in a *locked* glove box, particularly when the suspect is in the patrol car, detained by a police officer, while another officer looks in the glove box of the suspect's car.  We turn to the relevant case law for clarification of the quoted phrase in the present context.

The Supreme Court's opinion in <u>Michigan v. Long</u> explains that (1) the fact that the detainee is "under the control" of officers does not eliminate the risk that he will gain access to a weapon, and (2) the time period during which the detainee "may gain immediate control" is the entire period from the initial stop to the detainee's departure.  The Court wrote:

> The Michigan Supreme Court appeared to believe that it was not reasonable for the officers to fear that Long could injure them, because he was effectively under their control during the investigative stop and could not get access to any weapons that might have been located in the automobile.  This reasoning is mistaken in several respects.  During any investigative detention, the suspect is in the control of the officers in the sense that he may be briefly detained against his will.  Just as a <u>Terry</u> [<u>v. Ohio</u>, 392 U.S. 1 (1968),] suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a <u>Terry</u> suspect in Long's position break away from police and retrieve a weapon from his automobile.  In addition, if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside.  Or, as here, the suspect may be permitted to reenter the vehicle before the <u>Terry</u> investigation is over, and again, may have access to weapons.  In any event, we stress that a <u>Terry</u> investigation, such as the one that occurred here, involves a police investigation at close range, when

the officer remains particularly vulnerable in part because a full custodial arrest has not been effected, and the officer must make a quick decision as to how to protect himself and others from possible danger. In such circumstances, we have not required that officers adopt alternate means to ensure their safety in order to avoid the intrusion involved in a <u>Terry</u> encounter.

<u>Long,</u> 463 U.S. at 1051-52 (internal citations, quotation marks, ellipses, and emphasis omitted).

If Defendant had broken away from the officers, obtaining a gun from inside the glove box would have taken only a moment more than obtaining a gun from anywhere else within the passenger compartment. To be sure, the tasks of getting a key and unlocking the glove box would delay Defendant somewhat; but a suspect who is able to break free of officers detaining him could also seize the keys, and the suspect may have another means of entry to the glove box, such as a key that would not be detected during a proper frisk or a weapons search of the vehicle. Furthermore, Defendant would have access to the gun at the conclusion of the encounter, assuming that he was only issued a citation and not arrested.

Recognizing these dangers, the federal courts of appeals to address the matter have upheld weapons searches of locked vehicles and glove boxes. In <u>United States v. Holifield,</u> 956 F.2d 665, 666-67 (7th Cir. 1992), officers who had stopped a car for speeding removed the occupants from the car, frisked them, examined the interior for weapons, and then removed the keys from the ignition

-7-

and unlocked the glove box, where they found a pistol. Because the driver's aggressive behavior justified the officers' fear for their safety, the Seventh Circuit upheld the search of the locked glove box. The court relied on the above-quoted passage from Long, observing that the passengers would eventually return to their car and that even before then, one or more could have broken free from the officers. Id. at 668-69. Similarly, the Eighth Circuit followed Long in upholding a weapons search of a locked glove box. United States v. Brown, 913 F.2d 570, 571-72 (8th Cir. 1990) (key lying on car's front seat). Cf. United States v. Mancillas, 183 F.3d 682, 699-701 (7th Cir. 1999) (locked car; follows Holifield); United States v. Woody, 55 F.3d 1257, 1269-70 (7th Cir. 1995) (search of locked glove box incident to arrest; cites Holifield with approval); United States v. Cheatwood, 575 F.2d 821, 825 (10th Cir. 1978) (seizure of firearms from front seat of car while defendant was standing at rear of car "was proper in relation to protection of the persons of the two police officers which necessarily involves the possibility that [the defendant] may have attempted re-entry of the vehicle to obtain the weapons for use against the officers").

Also instructive is United States v. Christian, 187 F.3d 663 (D.C. Cir. 1999), although the case did not involve a locked glove box. When two officers approached the defendant to question him as he stood by the side of a car, one saw a dagger on the front seat. Id. at 665. He asked the defendant for the car

keys, unlocked the car, and retrieved the weapon.  Id.  The defendant challenged the search of the locked car because "the car's interior was not within his immediate control" once the officer had taken the keys from him.  Id. at 670 (internal quotation marks omitted).  The court responded that the pertinent moment to assess the risk of the suspect's gaining immediate control of a weapon was just before the officers took protective measures—that is, before the officers obtained the keys.  "Otherwise, we might create a perverse incentive for an arresting officer to prolong the period during which the arrestee is kept in an area where he could pose a danger to the officer."  Id. (internal quotation marks omitted); cf. United States v. Ross, 456 U.S. 798, 807 n.9 (1982) (in explaining why warrant need not be obtained to search impounded vehicle that had been stopped on highway with probable cause, Court wrote: "[I]f an immediate search on the scene could be conducted, but not one at the station if the vehicle is impounded, police often simply would search the vehicle on the street—at no advantage to the occupants, yet possibly at certain cost to the police.").  The officers' actions were therefore justified under Long because "[i]t was not unreasonable to fear [the defendant] might lunge for the door, open it with the keys, and grab the knife."  Christian, 187 F.3d at 670.  The court also noted that the defendant might have been able to enter the car even without the keys, id. at

670-71, and that the defendant, if not arrested, eventually would have been permitted to reenter the car, id. at 671.

We agree with the analysis in the above cases, which also applies to this appeal. Before the two officers first arrived at Defendant's car and asked him to step out, Officer Downe had learned of Defendant's criminal record and dangerousness and had observed Defendant's furtive movements while being pursued. Thus, they had sufficient justification at that point to take the car keys and open the glove box. The delay in searching the glove box—while Defendant was removed to Officer Downe's patrol car and Officer Goad first searched the interior of Defendant's car—did not extinguish that justification. Moreover, as noted in Long, Defendant would certainly have had access to the gun after the citation was issued and he was released to go.

We recognize that "a protective search for weapons is limited in scope, but the fact that it is a limited search does not mean that it may not encompass the glove compartment. Protective searches are only limited in the sense that the officer conducting the protective search must first have a reasonable suspicion that the suspect is dangerous and the protective search must be directed only to locations which may contain a weapon and to which the suspect may have access." Holified, 956 F.2d at 669. Based on the information before the officers,

Officer Downe was justified in searching the locked glove box as part of the protective search.

## III.   CONCLUSION

We AFFIRM the judgment below.