**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 5, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

EVERETT CHARLES BRAKEMAN,

Defendant - Appellant.

No. 06-2139

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. CR-04-2524 RB)**

---

David J. Kimmelman, El Paso, Texas, for Defendant - Appellant.

Kelly H. Burnham, Assistant United States Attorney, Las Cruces, New Mexico, (David C. Iglesias, United States Attorney, Albuquerque, New Mexico, and Terri J. Abernathy, Assistant United States Attorney, Las Cruces, New Mexico, on the brief) for Plaintiff - Appellee.

---

Before **LUCERO**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **HARTZ**, Circuit Judge.

---

**HARTZ**, Circuit Judge.

---

Everett Brakeman was convicted in the United States District Court for the

District of New Mexico on two counts of being a felon in possession of firearms

and ammunition, one count of possession with intent to distribute less than five grams of methamphetamine, and one count of carrying a firearm during and in relation to a drug-trafficking crime. He appeals his convictions, claiming that the district court erred in denying his motion to suppress evidence seized as the result of two violations of the Fourth Amendment: (1) a warrant used to search his residence was defective because its description of the place to be searched was not sufficiently particular and (2) an officer's pat-down search of his person impermissibly extended to the contents of a glasses case after it was removed from his pocket. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## I.    BACKGROUND

### A.    Search Warrant

On May 29, 2004, Chaves County Sheriff's Deputy Marcos Franco had just responded to a call regarding a loud party when he observed Danny Calloway running from Mr. Brakeman's residence in a mobile-home park near the intersection of South Main and Monksdale in Roswell, New Mexico. When Franco stopped to determine what had happened, Calloway said that Mr. Brakeman had just shot at him. Calloway explained that he had gone to the mobile-home park to try to dispel suspicions that he had stolen drugs from Mr. Brakeman. He said that he had been shot at while he was looking for Mr. Brakeman outside his residence.

Deputy Franco was familiar with Mr. Brakeman and his home. During his field training the location had been pointed out to him as the residence of Mr. Brakeman, who was well known to the police. He had also stopped Mr. Brakeman previously and had routinely driven through the area. The primary building on the property was Mr. Brakeman's residence, which also served as his shop. It was white with a red stripe and a gray roof. An RV was connected to the residence by what appeared to be a utility connection. There was also at least one outbuilding on the property. A portion of the property was bordered by a chain-link fence partly lined with white "security" strips to block the view from outside. On the fence in front of the residence was a placard with the number "205" in white reflective lettering.

The day after his interview of Calloway, Deputy Franco applied for a warrant to search Mr. Brakeman's property for a gun and other evidence of the shooting. He completed an affidavit describing the property to be searched as follows:

> The property is located at 205 Monksdale in Roswell, New Mexico, Chaves County. The property is described as a white mobile home with red trim, single-wide. The front door faces south and the back door faces the north. The roof is constructed with metal, gray in color and is flat. The property has a chain link fence with white security lining. The address is displayed on a black metal box in the front yard, south side of the property as 205 in white letters, also has the name of Higgins, also in white letters. A shed, white in color, is located on the northwest side of the residence.

R. Doc. 61 at 2 (Mem. Op. & Order, June 1, 2005) (brackets omitted). A judge authorized the warrant. The record does not include the warrant itself, but we assume that the affidavit was attached to it. Boilerplate language on New Mexico's official search-warrant form states that a copy of the affidavit is attached to the warrant and authorizes a search of the place described in the affidavit. *See* N.M.R.A., Form 9-214; *see also United States v. Williamson*, 1 F.3d 1134, 1136 n.1 (10th Cir. 1993) (affidavit for warrant can be considered in assessing particularity of warrant when incorporated by reference and attached to warrant).

Deputy Franco and other officers executed the warrant on May 31. Mr. Brakeman was present when the officers arrived. He told them that a .22 rifle was inside the RV. In the course of executing the warrant, officers searched the residence, the RV connected to the residence, and an automobile on the property. They found a .22 rifle, a .25 automatic handgun, ammunition, paraphernalia for methamphetamine production, and marijuana.

Evidence at the suppression hearing showed that the affidavit's description of the location was ambiguous. The records of the County Assessor showed that 4242 South Main was the address for the entire trailer park that included Mr. Brakeman's property, and that 205 Monksdale (the address in the affidavit) was the mailing address for David Higgins, owner of the mobile-home park and Mr. Brakeman's neighbor and landlord. Mailboxes for the trailers were in a kiosk

at the corner of Monksdale and South Main.  Similar to Mr. Brakeman's residence, Higgins's home was white with a red stripe and gray roof, and was at least partly surrounded by a chain-link fence lined with white security strips.  The black mailbox (labeled "Higgins" and "205") referred to in the affidavit sat directly in front of his home rather than Mr. Brakeman's.  Deputy Franco testified that to obtain the address for the affidavit, he had reviewed the Sheriff's department files relating to Mr. Brakeman.  They showed that on previous occasions Mr. Brakeman had given law-enforcement officers both 205 Monksdale and 4242 South Main as his address, but he had given the Monksdale address more frequently.  Based on his familiarity with the area, Franco had decided that the Monksdale address was more appropriate for use in the affidavit.  The officers searched only Mr. Brakeman's property.

**B.    Pat-Down Search**

On September 15, 2004, Sergeant Daniel Ornelas and Deputy George Wallner of the Chaves County Sheriff's Department were on patrol when they drove by an RV being driven by Mr. Brakeman.  As the RV passed, Ornelas noticed in his rearview mirror that the RV had no license plate, so he made a U-turn to follow and stop Mr. Brakeman.  Mr. Brakeman pulled into a business parking lot before Ornelas activated his emergency lights.  A pickup truck with four passengers stopped near Mr. Brakeman's vehicle.  Ornelas recognized two of the pickup's passengers from previous drug-related incidents.

Sergeant Ornelas stopped near Mr. Brakeman's vehicle, turned on his emergency lights, and approached Mr. Brakeman. He asked Mr. Brakeman to get out of the vehicle, but Mr. Brakeman did not immediately do so. Ornelas and Deputy Wallner then approached the pickup. The occupants seemed nervous and were evasive in explaining what they were doing. Wallner noticed that the pickup also had no license plate and that the ignition had been altered so that it could be operated with a screwdriver. Ornelas asked the occupants to exit the vehicle.

Meanwhile, Deputy Wallner noticed that Mr. Brakeman had finally gotten out of the RV and appeared to be walking away from the officers. Wallner ordered Mr. Brakeman to stand near the back of the RV, and Mr. Brakeman complied. After backup officers arrived, Wallner asked Mr. Brakeman for identification, which he produced. When Wallner asked him whether he had any weapons on him, Mr. Brakeman responded that he had a pocketknife, but he said that he did not know where it was.

Deputy Wallner conducted a pat-down search. While patting down the outside of Mr. Brakeman's clothing, he felt an object shaped like a knife. He asked Mr. Brakeman whether it was the knife he had mentioned, and Mr. Brakeman responded that he did not know. Wallner reached into the pocket and retrieved a thin blue case, approximately five to six inches long, an inch wide, and half an inch thick. In Wallner's opinion the case could have contained a knife. When asked whether the knife was inside the case, Mr. Brakeman

responded that it was his glasses case. Wallner then opened the case and discovered several baggies of a substance that turned out to be methamphetamine. Wallner arrested Mr. Brakeman. Later he discovered the knife in one of Mr. Brakeman's pockets. An inventory search of the RV produced a handgun.

### C. Court Proceedings

After being indicted on eight counts of drug and firearm offenses, Mr. Brakeman filed motions to suppress evidence seized during the May 31, 2004, search of his home and the September 15, 2004, pat-down search. The district court denied both motions.

On June 17, 2005, a jury found Mr. Brakeman not guilty on four counts but convicted him on two counts of being a felon in possession of firearms and ammunition, *see* 18 U.S.C. §§ 922(g)(1), 924(e)(1); one count of possession with intent to distribute less than five grams of methamphetamine, *see* 21 U.S.C. § 841(a)(1) and (b)(1)(C); and one count of carrying a firearm and ammunition during and in relation to a drug-trafficking crime, *see* 18 U.S.C. § 924(c)(1)(A)(I). He was sentenced to 248 months' imprisonment.

## II. DISCUSSION

### A. Standard of Review

"When reviewing the denial of a motion to suppress, we accept the factual findings of the district court unless they are clearly erroneous. . . . On appeal of a denial of a suppression motion, we consider the totality of the circumstances and

view the evidence in the light most favorable to the government." *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998). "Determinations relating to the sufficiency of a search warrant . . . are conclusions of law . . . review[ed] *de novo*." *United States v. Danhauer*, 229 F.3d 1002, 1005 (10th Cir. 2000).

## B.    Particularity of the Search Warrant

Mr. Brakeman argues that the warrant to search his property was not sufficiently particular to satisfy the Fourth Amendment. He contends that the warrant described not his property but rather that of his neighbor, Mr. Higgins, and that when the officers executed the warrant and saw the mailbox with Higgins's name on it, they "were put on notice that their warrant was not sufficiently particular" and should have stopped the search. Aplt. Br. at 11. He further claims that the property description and the address were incorrect, so the sole source of information regarding the place to be searched was the executing officers' knowledge, in contravention of *Williamson*, 1 F.3d at 1136 (warrant invalid because "the officer's knowledge [cannot be] the *sole* source of information identifying the physical location of the [place to be searched]").

The Fourth Amendment states that warrants shall issue only "upon probable cause" and that they must "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. As we have stated, "The danger that the particular description requirement seeks to avoid is the threat of general and exploratory searches." *United States v. Lora-Solano*, 330 F.3d

1288, 1294 (10th Cir. 2003). Accordingly, "[p]ractical accuracy rather than technical precision controls" our determination of the adequacy of a warrant's description of the place to be searched. *Id.* at 1293 (brackets and internal quotation marks omitted). "A technically wrong address does not invalidate a warrant if it otherwise describes the premises with sufficient particularity so that the police can ascertain and identify the place to be searched." *Id.*

As an initial matter we note that the record on appeal does not contain the warrant, any accompanying attachments (such as the affidavit), or any helpful maps, photos, or other exhibits. The only available description of the place to be searched is that quoted in the district court's decision, which presumably took the description from the affidavit. Our review of this issue is accordingly very limited. As Mr. Brakeman appears to acknowledge in his brief by repeating word for word much of the district court's findings of facts, we must accept the facts as determined by the district court in its June 1, 2005, order, and review only the district court's legal conclusions. *See United States v. Martin*, 15 F.3d 943, 944–45 (10th Cir. 1994) (we adopt district court's factual findings when defendant does not challenge those findings and the record is insufficient for us to review them); *cf. United States v. Brewer*, 630 F.2d 795, 803 (10th Cir. 1980) (defendants' claim that search warrant was defective is not reviewable when appellate record did not include the challenged affidavit).

The warrant's description was sufficiently particular. Indeed, it describes—in some detail—Mr. Brakeman's property. Mr. Brakeman acknowledged as much when he conceded at oral argument that his property was at the "physical location" of 205 Monksdale.

The problem is that the description also fits Mr. Higgins's property. And the County Assessor's records suggest that "officially" the address in the affidavit is that of Higgins rather than Mr. Brakeman. Nevertheless, as a "[p]ractical" matter, *Lora-Solano*, 330 F.3d at 1293 (brackets and internal quotation marks omitted), the ambiguity was immaterial. To the extent that the warrant was unclear as to whether the property to be searched was Higgins's or Mr. Brakeman's, Deputy Franco's personal knowledge resolved the matter. Mr. Brakeman correctly cites *Williamson*, 1 F.3d at 1136, for the proposition that an officer's knowledge cannot be the *sole* means of determining what property is to be searched. But "[t]his court has not gone so far as to say that an officer's knowledge may not cure a technically inaccurate warrant—*Williamson* acknowledged just the opposite, provided that the officer's knowledge is not the *sole* source of the location." *Lora-Solano*, 330 F.3d at 1294; *see Harman v. Pollock*, 446 F.3d 1069, 1079 (10th Cir. 2006) (per curiam) ("inaccuracies" in the warrant were inconsequential because of the executing officer's "personal knowledge of the physical description of the structures to be searched"); *United States v. Occhipinti*, 998 F.2d 791, 799 (10th Cir. 1993) ("[T]he knowledge of the

-10-

executing officer can be considered in determining the sufficiency of the description [in a warrant]."); *United States v. Sturmoski*, 971 F.2d 452, 458 (10th Cir. 1992) (presence of officer familiar with the place to be searched "provided additional reliability that the correct premises would be searched"). *But cf. Groh v. Ramirez*, 540 U.S. 551, 560 (2004) (Fourth Amendment requirement that "persons or things to be seized" be particularly described not met when warrant failed to describe the items at all because "there can be no written assurance that the Magistrate actually found probable cause to search for, and to seize, every item mentioned in the affidavit").

We disagree with Mr. Brakeman's contention that Deputy Franco's knowledge was the sole source of the officers' information regarding the location. The description provided in the affidavit was in many respects quite detailed. Indeed, listing the address as 205 Monksdale appears to have provided more assistance to the executing officers than would have the actual mailing address of the property—4242 South Main, the address of the entire mobile-home park. The description was sufficiently accurate that any ambiguity could be cured by Franco's personal knowledge.

We conclude that the search warrant was sufficiently particular to satisfy the Fourth Amendment.

### C.    Pat-Down Search

-11-

Mr. Brakeman next challenges the pat-down search. He contends that Deputy Wallner's opening of the glasses case violated the Fourth Amendment because it was beyond the scope of an otherwise permissible search. He concedes that Wallner was justified in conducting the pat-down and that the glasses case could have contained a weapon. But he asserts that Wallner was not justified in opening the glasses case once it was removed from his pocket and out of his reach.

"[W]hen police officers have a reasonable suspicion based on specific and articulable facts that a properly detained driver may be dangerous and may gain immediate control of weapons, they may conduct a weapons search of the driver's person and the passenger compartment of the vehicle." *United States v. Palmer*, 360 F.3d 1243, 1246 (10th Cir. 2004) (internal quotation marks omitted). With respect to whether a suspect "may gain immediate control" of a weapon, we have observed that "(1) the fact that the detainee is 'under the control' of officers does not eliminate the risk that he will gain access to a weapon, and (2) the time period during which the detainee 'may gain immediate control' is the entire period from the initial stop to the detainee's departure." *Id.*; *see Michigan v. Long*, 463 U.S. 1032, 1051-52 (1983).

Accordingly, a weapons search may extend to containers not within the immediate reach of the suspect. In *Palmer* we upheld the search of a locked glove box in an automobile even though the defendant was seated in the officer's

patrol car. *See* 360 F.3d at 1248. We reasoned that the search of the compartment was justified even if the defendant could not access the glove box at the moment of the search because he "would certainly have had access to the gun [in the glove box] after the citation was issued and he was released to go." *Id.*; *see United States v. McClinnhan*, 660 F.2d 500, 504 (D.C. Cir. 1981) (officer could search briefcase for weapons when it was removed from defendant's reach because "[m]erely separating McClinnhan from his briefcase . . . would obviate the danger only for the length of the stop; at some point they would be compelled to return the briefcase to [him] and thus place themselves in the danger they sought to avoid"), *abrogated on other grounds as recognized by United States v. Thompson*, 234 F.3d 725, 728 (D.C. Cir. 2000).

The glasses case could have contained a weapon, such as the knife Mr. Brakeman proclaimed to have. Consequently, Deputy Wallner's search could extend to its contents to ensure that nothing dangerous was inside. Even though Mr. Brakeman was detained and the glasses case was no longer in his possession, Mr. Brakeman might have broken free and seized the case; and if he were later released, he would have regained access when Wallner returned the unopened glasses case to him. *See id.* Perhaps measures other than searching the glasses case could have effectively protected the officers; but the Supreme Court has "not required that officers adopt alternative means to ensure their safety in order to avoid the intrusion involved in [an investigative detention]." *Long*, 463 U.S. at

-13-

1052.  The search of the case was thus justified and was properly "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of [the officers]."  *Terry v. Ohio*, 392 U.S. 1, 29 (1968).

Mr. Brakeman contended at oral argument (although not in his brief) that Deputy Wallner should not have opened the glasses case before completing his pat-down search to see whether the knife Mr. Brakeman claimed to have was elsewhere on his body.  Only if this search had not produced the knife, he argued, would Wallner have been justified in opening the glasses case.  This argument not only was raised too late, *see United States v. Gonzalez-Coronado*, 419 F.3d 1090, 1094 n.7 (10th Cir. 2005) (argument raised for first time at oral argument need not be addressed), but also ignores the purpose and justification of a weapons search.  A weapons search during a traffic stop is justified when there is "reasonable suspicion based on specific and articulable facts" that the subject "may be dangerous and may gain immediate control of weapons."  *Palmer*, 360 F.3d at 1246 (internal quotation marks omitted).  Mr. Brakeman does not dispute that a weapons search of his person was justified.  Such a search did not need to be confined to finding the single weapon Mr. Brakeman professed to have; rather, Wallner could look for any and all weapons he may have possessed.  *See id.* at 1248 ("Protective searches are only limited in the sense that the officer conducting the protective search must first have a reasonable suspicion that the

suspect is dangerous and the protective search must be directed only to locations which may contain a weapon and to which the suspect may have access." (internal quotation marks omitted)). When a suspect states that he is carrying a particular weapon and an officer finds that weapon during a pat-down search, the officer is not required to assume that the suspect is carrying no other weapons.

We conclude that the search of the glasses case did not violate Mr. Brakeman's Fourth Amendment rights.

## III. CONCLUSION

We AFFIRM the district court's judgment.