In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2262

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT LEWHIM LEO, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 13-CR-123 — **Charles N. Clevert, Jr.**, *Judge.*

ARGUED DECEMBER 17, 2014 — DECIDED JULY 2, 2015

Before WILLIAMS, SYKES, and HAMILTON, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* After a 911 caller reported that Robert Leo had attempted to commit a burglary and was in possession of a gun, police officers stopped Leo, cuffed his hands behind his back, emptied his backpack, and found a gun. The officers soon learned that the 911 caller had been mistaken about the attempted burglary, but Leo was charged with possession of a firearm by a felon. *See* 18 U.S.C. § 922(g)(1). He moved to suppress the gun because the police officers who had

detained him were conducting an investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968), and were not authorized by that decision to rifle his backpack. The district court rejected this contention, explaining that searching Leo's backpack without a warrant was necessary for the protection of the officers and the public. Leo pleaded guilty and was sentenced to 37 months' imprisonment, but reserved the right to appeal the denial of his motion to suppress. Because we conclude that there was no probable cause or basis in *Terry* for the warrantless search, we vacate Leo's conviction and remand for further proceedings.

## I. BACKGROUND

One morning in May 2013, Robert Ortiz, a police officer for the City of Racine, Wisconsin, was driving an unmarked car when he spotted two young men in black hoodies standing on the sidewalk. He recognized one of them as Enrique Aranda, a cousin of his wife with prior convictions for drug possession, burglaries, and disorderly conduct. Ortiz did not know Leo, the defendant, who was with Aranda. As Ortiz drove past, he saw Aranda and Leo running into the yard of a nearby duplex. Ortiz quickly lost sight of Leo, but he caught a glimpse of Aranda standing by an open screen door on the side of the building.

As Officer Ortiz reached the end of the block and turned around, the police dispatcher announced that a 911 caller was reporting a possible burglary in progress in the lower unit of the duplex where Ortiz had last seen Aranda. The dispatcher radioed that the caller lived in the upper unit of the duplex and had described the suspected burglars as two Hispanic men wearing black hoodies, one of them with a gun, possibly a revolver. The caller also had reported that he just saw an un-

marked police car pass by. Ortiz told the dispatcher what he had seen and where he was, and other officers radioed that they were on their way. Because he was outnumbered, Ortiz moved where he could watch the duplex and waited for back-up.

As Ortiz waited, Leo reappeared and began walking with Aranda away from the duplex toward the Head Start preschool next door. Ortiz observed that Aranda still was wearing a black hoodie but that Leo now was wearing a red jacket or sweat-shirt, and had a backpack. Around this time, the dispatcher reported that the 911 caller had given an update saying that one of the suspects had changed into a red jacket or sweatshirt, and that the gun was in a backpack.

When Officer Ortiz saw Leo and Aranda reach the Head Start parking lot and continue toward the entrance, he ran up to them, announced that he was a police officer, and ordered them to stop. The two young men glanced back but kept walk-ing. Ortiz drew his gun, held it at his side, and again com-manded the pair—this time in a louder voice—to stop. Leo and Aranda then paused 15 to 20 feet from Ortiz, who told Aranda to come to him. Aranda complied, so Ortiz put away his gun and handcuffed him. Meanwhile, Officer Michael Seeger had arrived in time to see Ortiz order Leo and Aranda to stop. When they did not, Seeger ran after Leo, who was nearing the preschool's front entrance. Seeger cuffed Leo's hands behind his back.

By this time, another officer had gone to the duplex and in-terviewed the upstairs resident who called 911. The caller had seen the officers stop Leo and Aranda, and confirmed that the two men were the ones who had tried breaking into the down-

stairs unit. The dispatcher relayed this information to Officers Ortiz and Seeger.

The officers separated Leo and Aranda by 20 to 30 feet. Ortiz frisked Aranda but found nothing. Aranda explained that he had just stopped at a friend's house and was on his way to get $5 from his mother, who worked at the preschool. As Leo conversed with Aranda, Seeger patted down Leo. The officer did not find a gun. Without asking any questions, he then immediately opened and emptied Leo's backpack, which he had taken from Leo and placed on the ground. Inside were a black hoodie, a digital scale with marijuana residue, plastic baggies, three bullets in a box, and a loaded revolver wrapped in cloth.

After finding the gun, the officers learned that the 911 caller had been mistaken about the attempted burglary. The residents of the duplex's lower unit had been interviewed and said they knew Leo and Aranda, and that the men had not tried to break in. By this time, however, the officers had learned that Leo is a felon (at the time of the search, he was on probation for attempted burglary and possession of marijuana). He was arrested and charged with violating § 922(g)(1).

A magistrate judge conducted an evidentiary hearing on Leo's motion to suppress. The government's attorney maintained that the search of the backpack was lawful because the officers had "reasonable suspicion" that justified stopping Leo and also searching his backpack. Officer Ortiz testified that he had "made contact" with Leo and Aranda because he was concerned about the safety of teachers, parents, and children at the preschool. The officer insisted, however, that the two suspects were not under arrest when he handcuffed Aranda. Rather, Ortiz explained, he had restrained Aranda for safety reasons because, in his opinion, potential burglars and armed suspects

always present "a possibility of violent action." And, he added, unholstered guns also present a danger of accidental discharge. Ortiz conceded knowing that Aranda's mother worked at the preschool, as did Ortiz's wife, a niece of Aranda's mother. However, as Ortiz soon learned from the dispatcher, Aranda was violating his probation by being away from his residence. At that point, the officer continued, he had arrested Aranda for this violation and found that he was carrying $40. That discovery, Ortiz said, made him suspect that Aranda had lied about going to the preschool to get money from his mother. This suspicion about Aranda's story, though, arose only after Leo's backpack already had been searched.

Officer Seeger testified that he detained and handcuffed Leo to stop him "from reaching or grabbing the firearm." He said he was concerned about the safety of the officers and occupants of the preschool. Leo might have reached for his gun, Seeger explained, or the gun could have discharged accidentally. Like Officer Ortiz, Seeger acknowledged that he did not arrest Leo before finding his gun. Leo had only been "detained," Seeger insisted, when he was handcuffed. The officer testified that Leo had said several times, "I consent to a search." But even if Leo *had not* consented, Seeger added, he would have searched the backpack because Leo "matched exactly" the caller's description of the burglary suspect. Seeger acknowledged knowing that Ortiz's wife worked at the preschool. He did not say that he knew Leo to be a felon before rummaging through his backpack.

Aranda testified that he and Leo were walking to the preschool to get gas money from his mother when members of the Latin Kings pulled up in a car and threatened them. He said that he and Leo ran to the duplex next to the preschool,

knocked on the door, and hid behind the house. Aranda stated that, once the coast was clear, they continued walking to the preschool. He insisted that he did not know Leo had a gun and that he heard Leo tell Seeger that he *did not* consent to a search.

After the evidentiary hearing, the government submitted a brief arguing that the search of Leo's backpack was lawful because the officers had a "reasonable suspicion that he was armed and dangerous." The search of the backpack was reasonable, the government contended, because Leo—who, according to the 911 caller, had tried to commit a burglary and was armed—was about to enter a preschool and was initially unresponsive to the officers' commands. So, the government argued, the search of the backpack was necessary to protect not only the officers but also teachers, children, and parents from either an "active shooter situation" or an "accidental discharge of the firearm." In the alternative the government asserted that Leo had consented to the search of his backpack. The government did not argue, however, that the officers had probable cause to arrest the men and could search the backpack incident to arrest.

Leo countered that no urgency justified the warrantless search. He was handcuffed, Leo reminded the court, and the backpack was on the ground out of his reach. Leo maintained that he and the gun no longer posed a threat, leaving the officers without a reason for not getting a search warrant. Anyway, he insisted, the police could not reasonably have thought he was about to commit a shooting at the preschool because he and Aranda were suspected only of burglary and Ortiz knew that Aranda's mother worked at the preschool. Leo also insisted that he had not consented to the search of his backpack.

The magistrate judge recommended denying Leo's motion to suppress. *See* 28 U.S.C. § 636(b)(1)(B); FED. R. CRIM. P. 59(b)(1). The magistrate judge accepted Aranda's testimony that Leo had *not* consented to the search. Officer Seeger's contrary testimony was not credible, the magistrate judge reasoned, because for Leo to "spontaneously and repeatedly consent to a search" would have been odd. Nonetheless, the magistrate judge reasoned that the officers had been justified in believing that Leo's gun presented a safety issue even after he was handcuffed and so the gun should not be suppressed. The magistrate judge relied principally on *Michigan v. Long*, 463 U.S. 1032 (1983), which upheld the protective sweep of a car after a traffic stop, and *Cady v. Sheahan*, 467 F.3d 1057 (7th Cir. 2006), a civil case under 42 U.S.C. § 1983 involving a warrantless search of the plaintiff's briefcase during an investigatory detention.

Neither party objected to the magistrate judge's proposed findings of fact, but Leo did oppose the court's legal conclusions. He conceded the existence of reasonable suspicion to believe that he had tried to commit a burglary and that he was carrying a gun in his backpack. But he distinguished *Long* and *Cady* because, unlike his situation, the suspects in those cases were not handcuffed at the time of the search and could have gained control of a weapon. He also maintained that the search of his backpack could not be justified as a search incident to arrest because, he said, he was not arrested until after the search had occurred. Leo contended that the police had plenty of time to phone a judge and obtain a search warrant and thus the search was not justified by exigent circumstances.

The district judge directed the parties to brief whether Leo's presence in a preschool parking lot affected the lawfulness of

the search. The government said yes, contending that possessing a gun on "school" grounds is a felony under both state and federal law, even for someone with a concealed-carry permit. (The government cited only 18 U.S.C. § 922(q)(2)(A) and Wisconsin Statute § 948.605 in support of this contention. But the Wisconsin statute expressly allows a person with a concealed-carry permit to possess a gun on school grounds. *See* WIS. STAT. §§ 948.605(2)(b)1r, 175.60(1)(d), 175.60(1)(g). The federal statute similarly states that it does not apply "if the individual possessing the firearm is licensed to do so by the State in which the school zone is located." 18 U.S.C. § 922(q)(2)(B)(ii).) And anyway, the government added, Leo could not have had a Wisconsin concealed-carry permit because he was under 21 and a convicted felon. *See* WIS. STAT. §§ 175.60(3)(a), (c), 941.29(1)(a).

However, the government could not point to evidence that at the time of the search Officers Ortiz or Seeger knew Leo's age or that he was a felon. And without that information, Leo countered, they could not have assumed he was committing a gun crime. Moreover, he explained, a *preschool* is not a "school" under state or federal law. Wisconsin defines a "school" as "an educational program for one or more grades between grades 1 and 12 and which is commonly known as an elementary school, middle school, junior high school, senior high school, or high school." *Id.* § 948.61(1)(b). The Head Start facility, in contrast, serves only children who are 5 years old or younger. And the federal statute making it a crime to possess a gun in a "school" zone adopts each state's definition of "school." *See* 18 U.S.C. §§ 921(a)(26), 922(q).

The district judge adopted the unopposed finding that Leo had not consented to the search of his backpack but also agreed

with the magistrate judge that the search had been authorized as part of an investigatory detention under *Terry*. Relying on *Long* and *Cady*, the district judge reasoned that the search had ensured "the safety of the officers and the children and adults at the Head Start facility." The dispatcher had reported that Leo possessed a gun during an attempted burglary, the judge explained, so Officers Ortiz and Seeger had reason to think him dangerous. And Leo's handcuffs did not eliminate the danger, the judge continued, because he was not under arrest and would regain control of the backpack and gun once the officers released him.

The judge emphasized that the government had never contended that the officers acquired probable cause to arrest Leo or search his backpack before they found his gun. And so it follows, the district judge thought, the relevant issue was not "the scope of a post-arrest search while an arrestee is fully secured" but instead "the scope of a protective search or exigent circumstances search for officers' and others' safety during a Terry stop." This means, the judge added, that deciding whether the Head Start preschool is a "school" is unnecessary because the search was lawful no matter the answer.

## II. ANALYSIS

Before we address Leo's contentions on appeal, we emphasize that our task has been narrowed by the government's choice to bypass all but one limited defense of the backpack search.

### A. No Probable Cause for Warrantless Search

Warrantless searches are *per se* unreasonable under the Fourth Amendment unless one of few recognized exceptions applies. *Riley v. California*, 134 S. Ct. 2473, 2482 (2014); *Arizona*

*v. Gant*, 556 U.S. 332, 338 (2009). The single exception advanced by the government here comes from *Terry v. Ohio*, 392 U.S. 1 (1968). That exception allows police officers—during an investigatory stop founded on reasonable suspicion that a crime is being, has been, or is about to be committed—to frisk a detained person for weapons if the officers have an articulable suspicion that the person is both armed and a danger to the safety of officers or others. *Terry*, 392 U.S. at 30; *see Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993); *Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990); *Ybarra v. Illinois*, 444 U.S. 85, 92–94 (1979); *United States v. Howard*, 729 F.3d 655, 662 (7th Cir. 2013).

The government does not argue any other exception. The government has never suggested, for example, that the police officers searched Leo's backpack incident to arrest.[1] *See Riley*, 134 S. Ct. at 2483–85 (stating "categorical rule" that physical containers "immediately associated with the person of the arrestee" may be searched incident to arrest but declining to extend rule to data on cellphones); *United States v. Flores-Lopez*, 670 F.3d 803, 805 (7th Cir. 2012) ("[A] container found on the person of someone who is arrested may be searched as an incident to the arrest even if the arresting officers don't suspect that the container holds a weapon or contraband, and thus without any justification specific to that container." (citing *United States v. Robinson*, 414 U.S. 218, 236 (1973)). In fact, with

---

[1] We note that even a search that occurs before an arrest may be deemed lawful as incident to that arrest, so long as probable cause for an arrest existed independently of the evidence discovered during the search. *See Rawlings v. Kentucky*, 448 U.S. 98, 111 & n.6 (1980); *United States v. Jackson*, 377 F.3d 715, 716–17 (7th Cir. 2004); *United States v. Chartier*, 772 F.3d 539, 546 (8th Cir. 2014); *United States v. McCraney*, 674 F.3d 614, 618–19 (6th Cir. 2012); *United States v. Torres-Castro*, 470 F.3d 992, 997–98 (10th Cir. 2006).

the exception of a throwaway line in a footnote in its brief on appeal, the government has taken every opportunity— beginning with its attorney's failure to even *mention* probable cause at the suppression hearing—to convey that probable cause to arrest Leo was lacking despite an eyewitness reporting that Leo had openly brandished a gun while trying to burglarize a residence. *See Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 716 (7th Cir. 2013); *Matthews v. City of East St. Louis*, 675 F.3d 703, 706–07 (7th Cir. 2012). Indeed, not one of the government's submissions in the district court even includes the words "probable cause."

And the government's belated reference to probable cause in a footnote in its appellate brief—that "the officers had probable cause to search the backpack and would have discovered the gun had they obtained a warrant"—is not a contention that the search was *lawful*. Rather, the government's footnote invokes the inevitable-discovery doctrine, which allows the government to avoid suppression of evidence seized in violation of the Fourth Amendment upon showing that lawful conduct inevitably would have led to discovery of that evidence. *Howard*, 729 F.3d at 663. That exception to the exclusionary rule, like the underlying question of probable cause, was at least forfeited, and arguably waived, by the government's litigation strategy in the district court. *See United States v. Jones*, 713 F.3d 336, 350–51 (7th Cir. 2013); *United States v. Melgar*, 227 F.3d 1038, 1040 (7th Cir. 2000); *United States v. Marvin*, 135 F.3d 1129, 1135 (7th Cir. 1998); *United States v. Tracey*, 597 F.3d 140, 149 (3d Cir. 2010); *United States v. Archibald*, 589 F.3d 289, 295–96 (6th Cir. 2009).

We are given no reason to excuse that strategy, not that it matters. In this court the government has only compounded its

problems by tossing out a fresh assertion about probable cause
and inevitable discovery but then failing to cite any legal au-
thority or otherwise develop an argument. *See United States v.
Lewis*, 608 F.3d 996, 1000 (7th Cir. 2010); *United States v.
Wantuch*, 525 F.3d 505, 516 n.5 (7th Cir. 2008). Not even at oral
argument, when a judge's question prompted Leo's lawyer to
adamantly deny that the 911 caller's report had established
probable cause, did the government have anything to say on
the subject. As we often warn litigants, it is not our responsibil-
ity to make the parties' arguments for them. *See Wantuch*, 525
F.3d at 516 n.5.[2]

## B.  Warrantless Search Not Justified Under *Terry*

With that in mind, we turn to the single question presented
by this appeal: whether the police lawfully searched Leo's
backpack based only on reasonable suspicion during what the
parties agree was a *Terry* stop. Leo concedes that, under *Terry*,
the officers lawfully could have patted down the backpack to
search for weapons. But he maintains that safety concerns did
not justify opening and emptying the backpack because he was
handcuffed and out of reach of the backpack.

We agree with Leo that the warrantless search of his back-
pack exceeded the bounds of *Terry*. That decision provides that
an officer who during a lawful investigatory stop reasonably
suspects that the persons being investigated are armed and

---

[2] The government's brief also includes the odd suggestion that "exigent
circumstances" justified searching Leo's backpack. Exigent circumstances
might excuse getting a *search warrant* but not the absence of *probable cause*.
*See Groh v. Ramirez*, 540 U.S. 551, 559 (2004); *Kirk v. Louisiana*, 536 U.S. 635,
638 (2002). For the government to bandy about "exigent circumstances" af-
ter failing to argue probable cause is frivolous.

dangerous may "conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Terry*, 392 U.S. at 30. This limited protective search may include a pat-down of the suspect's effects, including a bag. *See United States v. Adamson*, 441 F.3d 513, 521–22 (7th Cir. 2006); *United States v. Hernandez-Mendez*, 626 F.3d 203, 213 (4th Cir. 2010); *United States v. Muhammad*, 463 F.3d 115, 123–24 (2d Cir. 2006).

The government maintains that the full search of Leo's backpack is authorized by *Michigan v. Long*, 463 U.S. 1032 (1983). But *Long*—which upheld a police officer's protective search of a car during a *Terry* stop—is readily distinguishable. First, the Supreme Court has recognized a diminished expectation of privacy in a car, partly because cars that travel on public roads are subject to "pervasive regulation." *See Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996); *California v. Carney*, 471 U.S. 386, 391–92 (1985). Second, *Long* involved a roadside encounter with a motorist—a type of encounter which, the Supreme Court emphasized, is "especially fraught with danger to police officers." *Long*, 463 U.S. at 1047. Third, the Court in *Long* was careful to emphasize that the search of the car was lawful because the officers had a reasonable belief that the suspect was dangerous and may have been able to "gain immediate control of weapons." *Id.* at 1049–50.

In contrast, the search here did not involve a car or a roadside encounter, nor did the officers have a reasonable belief that Leo could get "immediate control" of the gun in his backpack. The reasonableness of a search is evaluated "on the basis of the facts as they existed at the time" of the search. *United States v. Jacobsen*, 466 U.S. 109, 115 (1984); *see Terry*, 392 U.S. at 21–22; *United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir.

1995). And at the time of the search in this case, Leo's hands were cuffed behind his back (as were Aranda's), the officers already had frisked both men and found no weapons, and the backpack was in Officer Seeger's hands and no longer in Leo's possession. So when Seeger unzipped and emptied the backpack, it was inconceivable that either Leo or Aranda would have been able to lunge for the bag, unzip it, and grab the gun inside. *See Gant*, 556 U.S. at 343 (holding that officer safety justifies search of arrestee's car incident to arrest "only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search"); *United States v. Tejada*, 524 F.3d 809, 811–12 (7th Cir. 2008) (explaining in the context of search incident to arrest that it is "inconceivable" that defendant who was handcuffed, face down on the floor, and surrounded by police officers could have opened entertainment center and unzipped travel bag inside it to reach for weapon).

The government cites *Cady v. Sheahan*, 467 F.3d 1057 (7th Cir. 2006), for the proposition that, "even in the context of *Terry* stops, this Court has recognized that the need to protect officers and the public can sometimes justify going beyond a traditional pat-down search." But the operative word in the government's proposition is *sometimes*. Our decision in *Cady* is limited to the facts of that case: *Cady* did not announce a new rule that officers *always* are justified in rummaging through a person's bag during a *Terry* stop. The officers in *Cady* spotted a disheveled man lurking in the bushes outside of a courthouse while the building was closed. *See Cady*, 467 F.3d at 1059. When they questioned him about his reason for being there, the man was evasive and kept reaching into his briefcase. *See id.* at 1059, 1062. It was only then that the officers took his briefcase and checked it for weapons. *See id.* In contrast to *Cady*, Leo was not

rummaging through his bag during the confrontation, nor did the officers question him before searching his backpack. Instead, Officer Seeger handcuffed him and, without saying a word, grabbed and emptied the bag. Any suggestion that the officers here acted out of a concern for their own safety is undermined by the government's concession at oral argument that, because both Leo and Aranda were handcuffed, there was no immediate threat to officer safety at the time of the search.

The government counters that the police officers acted on legitimate safety concerns because they "did not have authority to detain Leo indefinitely" and thus he might "be released in the parking lot of the preschool with a weapon in his backpack." Leo emphatically agrees that the officers could not hold him indefinitely based on reasonable suspicion, but he insists that, if the officers could not develop their reasonable suspicion into probable cause during the investigatory stop, "the Fourth Amendment demands that he was free to leave and to take his belongings with him."

Leo has the better argument. As the government concedes, a *Terry* stop cannot continue indefinitely, *see United States v. Sharpe*, 470 U.S. 675, 685 (1985), yet the government is wrong in thinking that this legal principle could justify searching Leo's backpack. "A *Terry* investigative stop is 'a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity.'" *United States v. Bullock*, 632 F.3d 1004, 1014–15 (7th Cir. 2011) (quoting *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995)). A stop that is too prolonged becomes "a de facto arrest that must be based on probable cause." *Id.* at 1015. Thus, one of three things must happen during a *Terry* stop: (1) the police gather enough information to develop

probable cause and allow for continued detention, *see United States v. Beltran*, 752 F.3d 671, 677–78 (7th Cir. 2014); (2) the suspicions of the police are dispelled and they release the suspect, *see United States v. Childs*, 277 F.3d 947, 952 (7th Cir. 2002) (en banc); or (3) the suspicions of the police are *not* dispelled, yet the officers have not developed probable cause but must release the suspect because the length of the stop is about to become unreasonable, *see Illinois v. Wardlow*, 528 U.S. 119, 126 (2000); *United States v. Place*, 462 U.S. 696, 709–10 (1983); *Liberal v. Estrada*, 632 F.3d 1064, 1081–82 (9th Cir. 2011); *United States v. Peters*, 10 F.3d 1517, 1522 (10th Cir. 1993).

By forgoing any reliance on probable cause, the government has conceded that the first scenario does not apply here. Nor is the second scenario relevant because, plainly, the police officers' suspicions had not been dispelled before Leo's backpack was searched. That leaves the third scenario, which the government finds unsatisfying and apparently would prefer to revise by allowing an officer conducting a *Terry* stop to do a full search of a suspect if the detention is in danger of becoming too long. But this step, no matter how convenient for the police, is *not* one that is authorized by *Terry* or any other precedent.

We are not free to ignore *Terry* or to rewrite that decision to suit the government. And, anyway, the government's argument is disingenuous: The search of Leo's backpack was *not* a last-ditch attempt by the officers to find evidence of a crime before the duration of the stop exceeded constitutionally permissible bounds. Officer Seeger searched the backpack *immediately*, without even asking Leo to identify himself. *See Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cnty.*, 542 U.S. 177, 186–87 (2004) (explaining that "it is well established that an officer

may ask a suspect to identify himself in the course of a *Terry* stop" and holding that Fourth Amendment permits a state to require "a suspect to disclose his name in the course of a valid *Terry* stop"). If the officers had instead identified Leo *before* searching his backpack, they could have contacted dispatch and quickly learned that he was a felon who was violating his probation.

We recognize that Officers Ortiz and Seeger may have balked at the thought of letting Leo enter the preschool with his backpack. But if the officers were concerned about the safety of the preschool's occupants, nothing prevented them from following Leo into the building after the investigatory stop to keep an eye on him in case he attempted any wrongdoing. *See United States v. Jones*, 132 S. Ct. 945, 953 (2012) ("This Court has to date not deviated from the understanding that mere visual observation does not constitute a search."); *Kyllo v. United States*, 533 U.S. 27, 32 (2001); *United States v. Knotts*, 460 U.S. 276, 282 (1983).

There are other flaws with the government's argument that the search of Leo's backpack was justified solely by the possibility that Leo would enter the preschool with a gun. Leo maintained in the district court that the Head Start preschool is not a "school" under either Wisconsin or federal gun laws, *see* 18 U.S.C. § 921(a)(26); WIS. STAT. § 948.61(1)(b), and that the police officers therefore had no reason to think that he unlawfully possessed a gun in a school zone, *see* 18 U.S.C. § 922(q)(2)(A); WIS. STAT. § 948.605(2).

The government has never responded to Leo's contention that the Head Start facility is not a "school" under these statutes, nor did the government ever charge Leo with possessing a gun in a school zone in violation of state or federal law. And

there is no evidence in the record to show that Leo's possession of a handgun in the preschool parking lot violated any other Wisconsin gun law, such as the trespass statute. *See* WIS. STAT. § 943.13(1m)(c). Moreover, Wisconsin law generally permits a person who is 21 or older and has not been convicted of a felony to obtain a concealed-carry license. *See id.* § 175.60(3). At the time of the search, the officers knew neither Leo's age nor criminal history, nor did they inquire whether he had a license to carry a concealed firearm. *See id.* § 175.60(2g)(c).

In closing, we note that the Supreme Court has made clear that the Second Amendment protects the individual right to keep and bear arms, *see District of Columbia v. Heller*, 554 U.S. 570, 635–36 (2008), and applies equally to the states through the Fourteenth Amendment, *see McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). And we have held that, subject to reasonable restrictions, the Second Amendment protects the right to carry a gun in public. *See Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). Considering these important developments in Second Amendment law together with Wisconsin's gun laws, we cannot accept the government's contention that the possibility of a gun in Leo's backpack posed a unique threat that justified a full search of the bag on less than probable cause. *See United States v. Williams*, 731 F.3d 678, 694 (7th Cir. 2013) (Hamilton, J., concurring in part and concurring in judgment) ("After *Heller* and *McDonald*, all of us involved in law enforcement, including judges, prosecutors, defense attorneys, and police officers, will need to reevaluate our thinking about these Fourth Amendment issues and how private possession of firearms figures into our thinking.").

### III. CONCLUSION

Accordingly, the judgment of conviction is VACATED, and the case is REMANDED for further proceedings consistent with this opinion.