# COURT OF APPEALS OF VIRGINIA

**Record No. 1783-24-2**

DEVON LAMAR WASHINGTON

v.

COMMONWEALTH OF VIRGINIA

Present: Judges Friedman, Raphael and White

Argued at Richmond, Virginia

Opinion Issued April 14, 2026

## FROM THE CIRCUIT COURT OF THE CITY OF FREDERICKSBURG
J. Martin Bass, Judge Designate[1]

Anna R. Lindemann (Bowen, Clements, Lindemann & Scott, PLLC, on briefs), for appellant.

Elizabeth Kiernan Fitzgerald, Assistant Attorney General (Jason S. Miyares,[2] Attorney General, on brief), for appellee.

## PUBLISHED OPINION BY
## <u>JUDGE KIMBERLEY SLAYTON WHITE</u>

Following his conditional guilty pleas, the Circuit Court of the City of Fredericksburg convicted Devon Lamar Washington of distributing a controlled substance, simultaneously possessing a firearm and a controlled substance with the intent to distribute, illegally possessing a machine gun, and carrying a concealed weapon. By final order entered October 15, 2024, the trial court sentenced him to a total of 15 years and 12 months of incarceration, with 11 years and 27 months suspended. On appeal, Washington asserts that the trial court erred in denying his motion to suppress evidence seized from his backpack. For the following reasons, we affirm.

---

[1] Judge Gordon F. Willis heard and ruled on the appellant's suppression motion, heard the appellant's guilty plea, and entered the conviction order.

[2] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

BACKGROUND

On appeal of a trial court's denial of a motion to suppress, this Court views the facts "in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences." *Hill v. Commonwealth*, 297 Va. 804, 808 (2019) (quoting *Commonwealth v. White*, 293 Va. 411, 413-14 (2017)). "We also presume—even in the absence of specific factual findings—that the trial court resolved all factual ambiguities or inconsistencies in the evidence in favor of" the Commonwealth as the prevailing party below. *Id.*

On September 28, 2023, the Fredericksburg Police Department received several complaints regarding criminal activity occurring around the outdoor pavilion of the Heritage Park townhomes. Detective Stephen Lamar knew this area to be a "high narcotics distribution area." Detective Lamar watched the area that afternoon and observed multiple people congregated there, including Teihmaurie Breckenridge. From a previous investigation, Detective Lamar knew that Breckenridge was associated with a gang and was involved in "distribution of illegal contraband." Several of the individuals wore backpacks, and Detective Lamar knew from his training and experience that individuals who sell illegal narcotics often store such items in backpacks. Detective Lamar did not see any members of the group using narcotics or engaging in any other criminal activity.

After approximately 30 minutes, the group dispersed, and Detective Lamar left. When he returned several hours later, he saw what appeared to be the same group of six to eight individuals, including Breckenridge and, now, Washington[3] gathered outside of 1008 Heritage Park, about 75 feet from the pavilion. Detective Lamar radioed Officer David Hibbits, and they decided that multiple officers would make consensual contact with the group to see "if there was any crime occurring." Officer Hibbits[4] and Officer Funez approached the group from one side of the building,

---

[3] At the time, Detective Lamar was not familiar with Washington.

[4] The first name of some of the officers is not included in the record before this Court.

and Detective Lamar, Officer Cash, and Officer Rajieri approached from the opposite side. All the officers were in uniform.

When the officers neared the group, Breckenridge and Washington ran. Officer Hibbits and Officer Funez intercepted and detained them. As the officers detained Washington, he removed his backpack and threw it against the wall of the nearby building. Officer Hibbits then placed Breckenridge in handcuffs while Officer Funez handcuffed Washington.

Officer Hibbits frisked Breckenridge and located a loaded firearm concealed in his front waistband. Officer Hibbits then frisked Washington's backpack by patting the outside without opening it. He "readily identified what felt like a firearm" in the backpack. Officer Hibbits then searched the backpack and found an AR-style rifle without a serial number. He also found 13 grams of suspected MDMA,[5] a digital scale, $380, and an empty package labeled "Oxycodone."

The officers arrested Washington and Breckenridge, and charged Washington with distributing a controlled substance, possessing a firearm while possessing a controlled substance with the intent to distribute, unlawfully possessing a machine gun, and carrying a concealed weapon. Washington moved to suppress the evidence. Washington asserted that the officers lacked reasonable suspicion either to seize him or to pat down his backpack.

Detective Lamar and Officer Hibbits testified at the joint suppression hearing. On cross-examination, Detective Lamar stated that he did not see anyone in the group smoking marijuana or engaging in any unlawful behavior during either period of surveillance. Officer Hibbits testified that he was the police department's single point of contact with the Heritage Park townhomes. In that capacity, he met monthly with management and received numerous reports of loitering, trespassing, and drug activity, particularly at or near the pavilion. Officer Hibbits also said

---

[5] Methylenedioxymethamphetamine or MDMA is classified as a Schedule I drug under the Controlled Substances Act. *See* 21 U.S.C. § 812.

he was familiar with Breckenridge and Washington and had seen music videos on the internet in which Breckenridge and Washington displayed firearms.

Officer Hibbits further testified that before he and the other officers approached the group, he received a service call about "individuals loitering in front of Building 1008 [who] were smoking marijuana in public." Detective Lamar and Officer Hibbits both testified that Washington and Breckenridge ran as the officers approached. On cross-examination, Officer Hibbits described their pace as a jog rather than a sprint. He elaborated that Detective Lamar, Officer Rajieri, and Officer Cash first approached the group while he and Officer Funez remained hidden behind the building. As Washington and Breckenridge ran in the opposite direction of the three approaching officers, Officer Hibbits and Officer Funez emerged and intercepted them. Officer Hibbits also confirmed that Washington was handcuffed before he patted down the backpack.

At the close of the evidence presented during the suppression motion, Washington's counsel first argued that the officers unconstitutionally seized Washington because they had no reasonable articulable suspicion he was engaging in criminal activity. Alternatively, counsel asserted that the "frisk" of Washington's backpack was an unlawful search because he was handcuffed at the time, thereby removing any present danger to the officers.

The trial court concluded that, under the totality of the circumstances, the officers had reasonable articulable suspicion that crime was afoot when they seized Washington and Breckenridge. The trial court considered Detective Lamar's knowledge of past drug activity at the Heritage Park townhomes and his knowledge that backpacks were used to transport and conceal illegal narcotics. Detective Lamar also knew Breckenridge to be involved with a gang and with narcotics distribution.

Further, the officers had received a service call indicating that several individuals were smoking marijuana in front of 1008 Heritage Park. Officer Hibbits, as the police department's

contact with the Heritage Park townhomes, previously received numerous complaints from management regarding illegal narcotics transactions occurring on the premises. Officer Hibbits also had seen videos in which Washington displayed firearms. Finally, Washington and Breckenridge ran as the officers approached the group. Considering all these factors, the trial court found that the officers "established a reasonable suspicion" sufficient to justify the seizure of Washington. Thus, the trial court denied Washington's motion to suppress.[6]

Washington subsequently entered a conditional guilty plea to the charges under Code § 19.2-254, preserving his right to appeal the trial court's order denying his motion to suppress. On appeal, Washington contends that the trial court should have granted the motion because the officers lacked the authority either to seize him or to frisk his backpack after he was handcuffed.

## ANALYSIS

### I. The Officers Had Reasonable, Articulable Suspicion Under *Terry* to Detain Washington

"In this Court, [Washington] 'bears the burden to show that the [trial] court committed reversible error by denying [his] motion to suppress.'" *Ayala v. Commonwealth*, 79 Va. App. 41, 49 (2023) (second and third alterations in original) (quoting *Keepers v. Commonwealth*, 72 Va. App. 17, 33 (2020)). A defendant's "claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact that we review *de novo* on appeal." *Baskerville v. Commonwealth*, 76 Va. App. 673, 684 (2023) (quoting *King v. Commonwealth*, 49 Va. App. 717, 721 (2007)). We defer to the trial court's factual findings, reviewing them "only for clear error," and "giv[ing] due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Id.* (quoting *Long v. Commonwealth*, 72 Va. App. 700, 712 (2021)). But we "independently decide whether, under the applicable law, the manner in which the

---

[6] The trial court did not expressly address Washington's argument that, even if the officers had reasonable suspicion to detain him, they lacked authority to frisk the bag.

challenged evidence was obtained satisfies constitutional requirements." *Id.* (quoting *Shiflett v. Commonwealth*, 47 Va. App. 141, 145-46 (2005)).

"The Fourth Amendment protects people from unreasonable searches and seizures." *Williams v. Commonwealth*, 71 Va. App. 462, 476 (2020). "Under *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny, a police officer 'may constitutionally conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *Bland v. Commonwealth*, 66 Va. App. 405, 413 (2016) (quoting *Beasley v. Commonwealth*, 60 Va. App. 381, 395 (2012)). "Reasonable, articulable suspicion requires an officer to possess, at the time of the stop, 'a particularized and objective basis for suspecting the particular person stopped[.]'" *Mitchell v. Commonwealth*, 73 Va. App. 234, 246 (2021) (alteration in original) (quoting *Heien v. North Carolina*, 574 U.S. 54, 60 (2014)). "Whether reasonable suspicion exists is 'based on an assessment of the totality of the circumstances.'" *McArthur v. Commonwealth*, 72 Va. App. 352, 359 (2020) (quoting *Harris v. Commonwealth*, 276 Va. 689, 695 (2008)).

"[W]hile a suspect's presence in a high crime area, standing alone, is not enough to support a reasonable particularized suspicion, it is a relevant contextual consideration in a *Terry* analysis." *Whitaker v. Commonwealth*, 279 Va. 268, 276 (2010). Likewise, while "headlong flight" from police officers "is not necessarily indicative of wrongdoing, it is a pertinent factor in determining reasonable suspicion." *Id.*; *see Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000) ("Headlong flight . . . is the consummate act of evasion.").

"Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Mitchell*, 73 Va. App. at 246-47 (quoting *Bland*, 66 Va. App. at 413). Reasonable suspicion "requires only 'some minimal level of objective justification.'" *Williams*, 71 Va. App. at 482 (quoting *Hairston v. Commonwealth*, 67 Va. App.

552, 561 (2017)).  "The possibility that an officer ultimately may prove to be mistaken or that there may be an innocent explanation for the facts giving rise to the officer's suspicion does not negate, in and of itself, the officer's reasonable, articulable suspicion." *Mitchell*, 73 Va. App. at 247.  Whether the officer's conduct is "reasonable 'is judged from the perspective of a[n objectively] reasonable officer on the scene allowing for the need of split-second decisions and without regard to the officer's [subjective] intent or motivation.'" *McArthur*, 72 Va. App. at 360 (alterations in original) (quoting *Thompson v. Commonwealth*, 54 Va. App. 1, 7 (2009)).

We conclude that the trial court did not err in finding that the officers had reasonable suspicion of criminal activity sufficient to support a *Terry* stop.  A *Terry* stop is authorized where circumstances give rise to a reasonable suspicion that an individual "is, or *is about to be*, engaged in criminal activity." *Hill*, 297 Va. at 813 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).  In this case, the officers knew that the Heritage Park complex was in a high crime area.  As the department's liaison to the management of the townhomes, Officer Hibbits received multiple reports of loitering, trespassing, and narcotics activity there.  Likewise, Detective Lamar knew that many narcotics-related arrests occurred there.  Although the officers did not see any members of the group using or distributing drugs, the police department received a service call alleging that a group of individuals was smoking marijuana in front of 1008 Heritage Park.  Detective Lamar also knew one member of the group, Breckenridge, to be associated with a gang and involved in narcotics trafficking.  Additionally, Officer Hibbits had seen Breckenridge and Washington display firearms in music videos.

Moreover, Washington and Breckenridge ran when uniformed police officers approached the group.  Washington asserts that his "jog is not [as] indicative of criminal activity as headlong flight might" be.  When explaining its ruling, the trial court stated that Officer Hibbits observed Washington and Breckenridge "running in the opposite direction" from the three approaching

- 7 -

officers, who were in uniform. Particularly given the Commonwealth's position as the prevailing party below, Detective Lamar's and Officer Hibbits's testimony supports a finding that Washington and Breckenridge fled from the uniformed officers. Accordingly, the trial court was allowed to consider this flight as attempted evasion, which is suggestive of wrongdoing. *See Wardlow*, 528 U.S. at 124; *Whitaker*, 279 Va. at 276.

Also, evidence of evasion was Washington's toss of his backpack just as the officers detained him. Officer Hibbits testified that when Washington saw the approaching officers, "Washington took off his backpack and basically threw it up against the wall where [we] had pushed them to detain them against the wall."

Washington's assertion that individuals are not required to engage in consensual encounters with the police does not negate the inferences that may be drawn from his flight. Further, the possibility of an innocent explanation for his actions does not conflict with the presence of reasonable suspicion. Washington's flight, considered together with all the other circumstances, provided at least a "minimal level of objective justification" for the officers' belief that criminal activity was afoot. *Williams*, 71 Va. App. at 482 (quoting *Hairston*, 67 Va. App. at 561). Accordingly, the trial court did not err in concluding that the officers had reasonable suspicion sufficient to justify a *Terry* stop.

II. The Officers Lawfully Frisked Washington's Backpack Under *Terry*

Washington further contends that the officers lacked reasonable suspicion to frisk his backpack. He does not contest that a backpack can be part of a person's outer clothing and therefore included in a limited search for weapons under *Terry*. Nor does he contest that he wore the backpack up to the moment when the officers detained him. But he argues that, because he was handcuffed, he "had no access to the bag, and therefore there was no credible or realistic threat to officer safety to justify frisking" it. However, we disagree.

To determine whether the officers had reasonable suspicion to pat down Washington's backpack, "we must consider 'the totality of the circumstances—the whole picture.'" *Gross v. Commonwealth*, 79 Va. App. 530, 537 (2024) (quoting *United States v. Sokolow*, 490 U.S. 1, 8 (1989)). "The inquiry is not whether an individual factor, viewed alone, 'is susceptible to innocent explanation,' but whether the various factors, '[t]aken together,' are sufficient 'to form a particularized and objective basis' for an officer's suspicion." *Bazemore v. Commonwealth*, 82 Va. App. 478, 493 (2024) (alteration in original) (quoting *United States v. Arvizu*, 534 U.S. 266, 277-78 (2002)). "Circumstances relevant in this analysis include . . . the time of the stop, the specific conduct of the suspect[ed] individual, the character of the offense under suspicion, and the unique perspective of a police officer trained and experienced in the detection of crime." *Bagley v. Commonwealth*, 73 Va. App. 1, 16 (2021) (alterations in original) (quoting *McCain v. Commonwealth*, 275 Va. 546, 554 (2008)). "The Supreme Court of the United States has stated that this analysis 'allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them.'" *Gross*, 79 Va. App. at 537-38 (quoting *Arvizu*, 534 U.S. at 273).

"An officer may not automatically conduct a search for weapons during the course of a *Terry* stop." *Baker v. Commonwealth*, 57 Va. App. 181, 189 (2010). Rather, the officer "may conduct a limited pat down for weapons if the officer reasonably believes that the criminal suspect may be armed and dangerous." *Jones v. Commonwealth*, 279 Va. 665, 672 (2010); *see Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009). "While the 'frisk' in *Terry* was limited to a pat-down of the suspect's outer clothing, [the United States] Supreme Court, lower federal court, and state court cases since *Terry* have extended the scope of a frisk beyond the suspect's outer clothing." *Servis v. Commonwealth*, 6 Va. App. 507, 516 (1988). As a result, we have applied *Terry* stops to include protective searches of vehicles, which are permissible when "the police officer possesses a

- 9 -

reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Bazemore*, 82 Va. App. at 492 (quoting *Michigan v. Long*, 463 U.S. 1032, 1049 (1983)). Thus, "when an officer has reasonable suspicion that a person is armed and dangerous, the officer can 'take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.'" *United States v. Gist-Davis*, 41 F.4th 259, 264 (4th Cir. 2022) (quoting *Terry*, 392 U.S. at 24).

In support of his argument that he posed no physical threat to officers' safety to justify the search of his backpack since he was handcuffed, Washington heavily relies on the decision of the United States Court of Appeals for the Fourth Circuit in *United States v. Buster*, 26 F.4th 627 (4th Cir. 2022). As both parties recognize, that decision is not binding on this Court.[7] However, Washington fails to recognize that *Buster* never addressed a compelling issue raised in our case. Here, the Commonwealth asks us to focus on the risk of returning an unfrisked bag to the defendant. Indeed, the Fourth Circuit in *Buster* acknowledged that "[t]his case does not present (and the parties have not raised) any question about whether or when officers may search a bag before returning it once a *Terry* stop concludes." *Id.* at 635. Thus, we resolve this issue that was neither addressed nor decided by *Buster*, as discussed below and further by our concurring colleague.

In *Buster*, "the officers opened the bag and examined its contents after they had tackled [him], handcuffed him, cut the bag off his body, and 'move[d] it away from his person.'" *Id.* at

---

[7] Indeed, "neither federal supremacy nor any other principle of federal law requires that a state court's interpretation of federal law give way to a (lower) federal court's interpretation." *Lockhart v. Fretwell*, 506 U.S. 364, 376 (1993) (Thomas, J., concurring). Rather, "[i]n our federal system, a state trial court's interpretation of federal law is no less authoritative than that of the federal court of appeals in whose circuit the trial court is located." *Id.*

634 (second alteration in original). While we acknowledge similarities between *Buster* and this case, specifically that both defendants were detained, handcuffed, and had their bags initially frisked and sequentially searched, without having possession of them during the search, the *Buster* court limited its holding to those issues raised by the parties. *Id.* at 635. In fact, that is where the similarities between *Buster* and this case end.

Moreover, in other federal court of appeals cases dealing with searching bags such as *United States v. Pardue*, 385 F.3d 101, 104 (1st Cir. 2004), *United States v. Leo*, 792 F.3d 742, 745 (7th Cir. 2015), and *United States v. Walker*, 615 F.3d 728, 730 (6th Cir. 2010), officers did not frisk the bag but rather immediately searched for weapons. In contrast, here, Officer Hibbits faced with evidence of a combination of relevant factors, first frisked Washington's backpack and strongly believed based on his training and experience that there was a weapon inside it. This distinction highlights that officers were genuinely concerned about their safety. The officer safety rationale underlying *Terry* necessarily encompasses situations where returning an unsearched bag to a detainee would expose officers to immediate danger.

While the *Buster* court never addressed the situation where officers' only option was to return a bag likely containing a weapon to a detained suspect after conducting a *Terry* stop or searching the bag for weapons, other cases have addressed the time period when a detained suspect may gain control of a weapon. In *United States v. Brakeman*, 475 F.3d 1206 (10th Cir. 2007), the court ruled that "the time period during which the detainee 'may gain immediate control' is the entire period from the initial stop to the detainee's departure." *Id.* at 1212 (quoting *United States* v. *Palmer*, 360 F.3d 1243, 1246 (10th Cir. 2004)). In that case, despite the suspect was detained and no longer had the glasses case in his possession, the court ruled that officers had legitimate safety concerns to open the suspect's glasses case to see if it contained the knife that the suspect admitted to having. *Id.* at 1213. After the *Terry* stop, the detainee would have

regained access to the knife once officers returned it to him, thereby endangering them. *Id.*

Thus, the court ruled officers did not violate the detainee's Fourth Amendment rights when they

opened the glasses case in search of the knife. *Id.*

After affording the Commonwealth all reasonable inferences flowing from the evidence, we

conclude that it was reasonable for the officers to conclude that Washington was armed and

dangerous when they initiated the *Terry* stop, frisked his backpack for weapons, detected a machine

gun, and subsequently opened the backpack. Therefore, the trial court did not err in denying

Washington's motion to suppress.

CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed.*

Raphael, J., concurring.

I agree with the Court that the officers had reasonable suspicion to detain and handcuff Teihmaurie Breckenridge and Devon Lamar Washington. Particularly after Officer Hibbits discovered the concealed weapon in Breckenridge's waistband, it was also reasonable for Hibbits to suspect that Washington too was armed and dangerous. Indeed, Hibbits had seen both suspects in music videos "displaying firearms." Hibbits was thus justified not only in patting down Washington for weapons, but in frisking his backpack for weapons after Washington threw it away from his person before being handcuffed.

I write separately to show that the protective patdown authorized in *Terry v. Ohio*, 392 U.S. 1 (1968), and extended to protective sweeps of passenger compartments of vehicles in *Michigan v. Long*, 463 U.S. 1032 (1983), encompasses the protective patdown of a backpack during a *Terry* stop, even when the suspect is handcuffed. The Court thus properly rejects Washington's argument that even if an officer has reasonable suspicion that a suspect is armed and dangerous, the officer cannot conduct a *Terry* frisk of the suspect's bag once the suspect has been handcuffed.

*Terry* held that a police officer may conduct a protective search of a suspect for weapons, even in the absence of probable cause that a crime had been committed, if the officer has a reasonable suspicion that the suspect is armed and dangerous. The Court appreciated the interests at stake: "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." *Terry*, 392 U.S. at 24-25. Still, those interests had to be balanced against the need for officer safety when an officer reasonably suspects that the person in close contact with him is armed and dangerous:

> [T]here must be a narrowly drawn authority to permit a reasonable
> search for weapons for the protection of the police officer, where

> he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime.

*Id.* at 27. "A search for weapons in the absence of probable cause to arrest, however, must, like any other search, be strictly circumscribed by the exigencies which justify its initiation." *Id.* at 25-26. And "it must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Id.* at 26.

*Terry* recognized that further caselaw was needed to develop the "limitations" that "the Fourth Amendment places upon a protective seizure and search for weapons." *Id.* at 29. Those limitations, the Court said, "will have to be developed in the concrete factual circumstances of individual cases." *Id.*

Fifteen years later, the Court in *Long* considered whether *Terry* justified a protective sweep for weapons in areas beyond a detained suspect's immediate reach. The suspect in *Long* was speeding and driving erratically when he drove into a ditch. Exiting the car, he appeared to the officers to be "under the influence of something." *Long*, 463 U.S. at 1036. As Long walked back toward his car, the officers saw through the open door "a large hunting knife" on the floorboard. *Id.* They stopped his progress and patted him down for weapons, finding none. As one officer waited with Long at the rear of the car, the other officer examined the interior of the vehicle "to search for other weapons." *Id.* In the course of doing so, that officer discovered 75 pounds of marijuana. *Id.*

The Court held that the protective sweep of the passenger compartment was "justified by the principles that we have already established in *Terry* and other cases." *Id.* at 1046.

> These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that

- 14 -

the suspect is dangerous and the suspect may gain immediate control of weapons.

*Id.* at 1049 (quoting *Terry*, 392 U.S. at 21). "If a suspect is 'dangerous,' he is no less dangerous simply because he is not arrested." *Id.* at 1050.

The Court specifically rejected the argument that a protective sweep was unwarranted because the suspect was with the other officer behind the car, out of reach of the interior. "Just as a *Terry* suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect in Long's position break away from police control and retrieve a weapon from his automobile." *Id.* at 1051. What is more, "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." *Id.* at 1051-52. The Court "stress[ed] that a *Terry* investigation . . . involves a police investigation 'at close range,' when the officer remains particularly vulnerable in part because a full custodial arrest has not been effected, and the officer must make a 'quick decision as to how to protect himself and others from possible danger.'" *Id.* at 1052 (emphasis omitted) (quoting *Terry*, 392 U.S. at 24, 28).

That situation differs in kind from when police have already arrested a suspect and secured him in handcuffs safely away from the search area. In *Arizona v. Gant*, 556 U.S. 332 (2009), the Court held that police may "search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search," or "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Id.* at 343 (quoting *Thornton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring in the judgment)). The Court said that "it will be the rare case in which an officer is unable to fully effectuate an arrest so that a real possibility of access to the arrestee's vehicle remains." *Id.* at 343 n.4.

The fact of arrest distinguishes that situation from a *Terry* stop. Indeed, *Gant* reaffirmed *Long* as one of the "established exceptions" to the warrant requirement. *Id.* at 346. The Court repeated that *Long* "permits an officer to search a vehicle's passenger compartment when he has reasonable suspicion that an individual, whether or not the arrestee, is 'dangerous' and might access the vehicle to 'gain immediate control of weapons.'" *Id.* at 346-47 (quoting *Long*, 463 U.S. at 1049). "*In the no-arrest case, the possibility of access to weapons in the vehicle always exists*, since the driver or passenger will be allowed to return to the vehicle when the interrogation is completed." *Id.* at 352 (Scalia, J., concurring) (emphasis added).

Our Court has repeatedly applied *Long* to permit protective sweeps of car-passenger compartments on reasonable suspicion that the suspect is armed and dangerous. *See Bazemore v. Commonwealth*, 82 Va. App. 478, 491-92 (2024); *Gross v. Commonwealth*, 79 Va. App. 530, 537 (2024); *Bagley v. Commonwealth*, 73 Va. App. 1, 21 (2021). We have also applied *Terry* to uphold the protective sweep of a motel room by an officer when the defendant—whom the officer reasonably suspected to be armed and dangerous—bolted into that room, placing the officer in "fear for [his] life." *Servis v. Commonwealth*, 6 Va. App. 507, 512, 516-17 (1988) (alteration in original). We reasoned that "[w]hile the 'frisk' in *Terry* was limited to a pat-down of the suspect's outer clothing, Supreme Court, lower federal court, and state court cases since *Terry* have extended the scope of a frisk beyond the suspect's outer clothing." *Id.* at 516-17 (collecting cases). We listed not only the Supreme Court's decision in *Long* to uphold protective sweeps in cars, but lower-court cases that permitted officers to *Terry* frisk a "briefcase," a "camera case," a "purse," and a "knapsack." *Id.*

At the same time, our appellate courts have emphasized that "*Terry* does not permit a generalized policy that authorizes a police officer to frisk all persons." *McCain v. Commonwealth*, 275 Va. 546, 555 (2008). An officer "may frisk for weapons only if he develops

reasonable suspicion during the stop 'to believe that the particular person to be frisked is armed and dangerous.' Such 'reasonable, individualized suspicion' is required '[e]ven in high crime areas,' where 'any given individual' may be armed." *Baker v. Commonwealth*, 57 Va. App. 181, 189 (2010) (alteration in original) (quoting *McCain*, 275 Va. at 554). Thus, for instance, our courts have invalidated *Terry* frisks when an officer "conduct[ed] a pat-down search of every person he interact[ed] with in th[e] neighborhood" in question, *McCain*, 275 Va. at 551; and also when an officer's "decision to perform a pat down resulted from his own generalized policy of patting down 'every pedestrian or subject on a bike' before returning to his patrol car to check their identification," *Baker*, 57 Va. App. at 192. Nothing the Court says here weakens any of those guardrails.

*Terry* and *Long* control the outcome of this case. Because Hibbits had reasonable suspicion to believe that Washington was armed and dangerous, Hibbits was authorized to perform a *Terry* frisk on the backpack that Washington threw against the wall just before he was handcuffed.[8] Here, as in *Terry* and *Long*, it would be "clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Long*, 463 U.S. at 1047 (quoting *Terry*, 392 U.S. at 24).

That conclusion is not altered by the fact that the officers handcuffed Washington *before* Hibbits patted down the backpack for weapons. We have repeatedly upheld *Terry* sweeps of car-passenger compartments when the suspect was detained in handcuffs outside the vehicle. *See Gross*, 79 Va. App. at 534; *Bagley*, 73 Va. App. at 10. Our Court has also repeatedly cited

_____

[8] "Brief, complete deprivations of a suspect's liberty, including handcuffing, 'do not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances.'" *Thomas v. Commonwealth*, 16 Va. App. 851, 857 (1993) (quoting *United States v. Crittendon*, 883 F.2d 326, 329 (4th Cir. 1989)). Washington does not contend that his handcuffing was unreasonable under the circumstances.

the same scenarios laid out in *Long*—that "the suspect may be able to escape such restraint, or may later regain access to the vehicle if he is not arrested." *Bazemore*, 82 Va. App. at 492 (quoting *Gross*, 79 Va. App. at 537). Those scenarios are no less fanciful for a suspect handcuffed during a *Terry* stop who is temporarily out of reach of a backpack, purse, or bag. To the contrary, once returned to a suspect who is not arrested, any weapons concealed in those personal items may be much easier to deploy at close range than a weapon hidden under the front seat of the suspect's car.

The Court is right to not follow *United States v. Buster*, 26 F.4th 627 (4th Cir. 2022). *Buster* held that *Terry* did not justify frisking the suspect's chest bag for weapons once the officers had tackled him, removed his bag, and placed him in handcuffs. *Id.* at 630, 635. The court reasoned that "even assuming the officer had reasonable suspicion that the bag contained a weapon (a point we need not decide), that fact alone could not generate reasonable suspicion that Buster was 'presently dangerous' after he was already restrained and no longer had access to the bag." *Id.* at 635. The court distinguished that situation from one where "a bag was opened *before* a suspect was subdued or while they were still within reach of the bag." *Id.* (emphasis added).

*Buster* cannot be squared with *Long*, a case that *Buster* failed to cite. Indeed, *Buster* also failed to mention Fourth Circuit precedent that holds, applying *Long*, that the police may conduct a protective sweep of a car's passenger compartment even when the suspect has been handcuffed outside the car. *See United States v. Elston*, 479 F.3d 314, 316, 320-21 (4th Cir. 2007). "Such a protective search is authorized even if the suspect is under police restraint at the time the search is conducted, because the suspect may be able to escape such restraint, or may later regain access to the vehicle if he is not arrested." *Id.* at 320. The Fourth Circuit added that "if the officers had not arrested Elston—still a possibility during the *Terry* stop—he would have been released from

the officers' physical control, creating a risk that he could retrieve his 9mm handgun from the truck."[9]  *Id.* at 321.  Like Elston, Washington, if had he been released, would have reacquired his backpack, giving him immediate access to the "AR pistol[]-patterned rifle" stuffed inside.

*Buster*'s failure to mention *Long* and *Elston* might be explained by bad briefing.  The parties' briefs failed to mention either case.  The court alluded to that omission, noting that "[t]his case does not present (*and the parties have not raised*) any question about whether or when officers may search a bag before returning it once a *Terry* stop concludes."  26 F.4th at 635 (emphasis added).  The opinion added that

> [b]ecause the government has *never so argued*, we do not consider whether at some point the officers might have acquired probable cause to arrest Buster for assault or some other offense and, if they did, whether the district court's decision not to suppress the firearm could have been justified on some other ground.

*Id.* (emphasis added).

In any case, *Buster* is not persuasive authority here because it never addressed the rationale of *Long* and *Elston*.  Police officers would be exposed to unacceptable dangers if they could not *Terry* frisk the bag of a person suspected of being armed and dangerous simply because they had handcuffed him first.  The doctrine in *Terry* and *Long* would become incoherent.  Officers who reasonably suspect a person during a *Terry* stop to be armed and dangerous could handcuff him, pat him down for weapons, and conduct a protective sweep of the passenger compartment of his car for weapons; but having first handcuffed the suspect, they could not pat down his backpack for weapons.  Such a rule would be incomprehensible.  Imagine explaining it to police officers during officer training.

---

[9] Incidentally, we followed *Elston* in both *Bazemore*, 82 Va. App. at 492, and *Gross*, 79 Va. App. at 537.

It is true that the Seventh Circuit has posited that the protective *Terry* sweep permitted by *Long* could be distinguished from searching the backpack of a suspect who has first been handcuffed. *United States v. Leo*, 792 F.3d 742, 749 (7th Cir. 2015). *Leo* cited the "diminished expectation of privacy in a car," noting that "cars that travel on public roads are subject to 'pervasive regulation.'" *Id.* (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)).

But that distinction is unpersuasive.[10] Neither the majority nor the dissent in *Long* ever mentioned the diminished expectation of privacy undergirding the "automobile exception"[11] as a reason to permit a *Terry* sweep of a car's passenger compartment. As we have said about *Long*, the "sole justification" for the "limited search[] for weapons is 'the protection of police officers and others nearby.'" *Bagley*, 73 Va. App. at 13 (quoting *Long*, 463 U.S. at 1049 n.14). To be sure, Justice Brennan dissented in *Long*, saying "[t]here [wa]s no reason . . . why the officers could not have pursued less intrusive, but equally effective, means of insuring their safety." 463 U.S. at 1065 (Brennan, J., dissenting). But the Court countered that it "ha[s] not required that officers adopt alternative means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter." *Id.* at 1052. The Court rejected Justice Brennan's contrary approach as a threat to officer safety.[12]

---

[10] *Leo* is also distinguishable because the officer there did not conduct a *Terry* frisk of the defendant's backpack after the defendant was handcuffed; the officer "immediately opened and emptied" it, finding contraband. 792 F.3d at 745. In fact, Leo "concede[d] that, under *Terry*, the officers lawfully could have patted down the backpack to search for weapons. But [Leo] maintain[ed] that safety concerns did not justify opening and emptying the backpack because he was handcuffed and out of reach of the backpack." *Id.* at 749.

[11] *See generally Collins v. Virginia*, 584 U.S. 586, 591-92 (2018) (describing the history and contours of the "automobile exception").

[12] *See* 463 U.S. at 1052 n.16 ("JUSTICE BRENNAN concedes that 'police should not be exposed to unnecessary danger in the performance of their duties,' but then would require that police officers, faced with having to make quick determinations about self-protection and the defense of innocent citizens in the area, must also decide instantaneously what 'less intrusive' alternative exists to ensure that any threat presented by the suspect will be neutralized. For the

The Court properly follows the same principles here.  In short, because Officer Hibbits had reasonable suspicion that a weapon was in the backpack that Washington threw against the wall just before he was detained and handcuffed, Hibbits properly frisked the backpack, discovering and securing the AR pistol-patterned rifle inside.

---

practical reasons explained in *Terry*, we have never required police to adopt alternative measures to avoid a legitimate *Terry*-type intrusion." (citations omitted)).